IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LINDA MANN, | ) | CASE NO. 1:10-CV-0255 |
| o/b/o A.W., | ) | |
|        Plaintiff, | ) | |
| | ) | |
| | ) | |
|   v. | ) | MAGISTRATE JUDGE McHARGH |
| | ) | |
| MICHAEL J. ASTRUE, | ) | **MEMORANDUM OPINION** |
| Commissioner of Social Security, | ) | |
| | ) | |
|       Defendant. | ) | |

      This case is before the Magistrate Judge pursuant to consent of the parties.  (Doc. 10).  The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Linda Mann's ("Mann" or "Plaintiff") application for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §1381, *et seq.*, on behalf of her son, A.W., is supported by substantial evidence and therefore, conclusive.

      For the reasons set forth below, the Court AFFIRMS the decision of the Commissioner.

## I. INTRODUCTION & PROCEDURAL HISTORY

      Plaintiff, on behalf of her child, A.W., filed an application for Supplemental Security Income benefits on May 5, 2006.  (Tr. 65-67).  Plaintiff's application for benefits was denied initially and upon reconsideration.  (Tr. 51, 59-61).

      Mann timely requested and was granted a hearing before Administrative Law Judge Stephen M. Hanekamp (the "ALJ" or "ALJ Hanekamp").  (Tr. 62).  The hearing was held on February 5, 2009.  (Tr. 28-50).  At the hearing, Mann and A.W. appeared and testified in person and were represented by counsel.  On July 22, 2009, ALJ Hanekamp issued a written decision denying

Plaintiff's application, finding that A.W. was not disabled.  (Tr. 15-27).  Plaintiff sought review of the ALJ's decision from the Appeals Council on August 20, 2009.  The Appeals Council denied Plaintiff's request thereby making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-4).  Plaintiff filed the instant complaint seeking judicial review of the Commissioner's decision.

A.W., who was born on December 5, 1997, was nine years old on the date the application was filed.  A.W. was eleven years old and in the fourth grade at the time of the hearing.  He was at all times a "school age child" for purposes of the Social Security regulations.  (Tr. 32-33).  S*ee* 20 C.F.R. § 416.926a(g)(2).

## II. EVIDENCE

### A. Personal & Educational Evidence

A.W. has a history of falling asleep in school and sleepwalking.  Mann testified that A.W. first began to behave strangely in November of 2005, around Thanksgiving.  (Tr. 36).  During this first episode, Mann stated that A.W. appeared to be asleep while sitting at the dining room table but that she could not wake him.  After a while, he stood up, but was unresponsive.  His mother laid him on the floor, and he began to shake.  Thereupon, Mann took him to the hospital.  (Tr. 37-38).  Yet, tests at the hospital could not find anything wrong with A.W.

Mann claimed that A.W. had these episodes several times a week, sometimes as often as twice a day during the onset of his condition.  (Tr. 41, 43).  During the episodes, A.W. occasionally became incontinent.  (Tr. 40-41).  In addition, it was difficult to wake him up.  (Tr. 40-41).  Mann further testified that she could predict when an episode was imminent based upon when her son had a headache or felt dizzy.  (Tr. 41).

2

A.W. also has a history of throwing things during his episodes, ranging from dishes to televisions.  Additionally, on a number of occasions, A.W. exited the home while sleepwalking and was once found two blocks away lying in the street.  (Tr. 44).  As a safety measure, Mann installed an alarm on A.W.'s  door to alert her when A.W. left his room at night.  (Tr. 44).  In the past, Mann also discovered A.W. submerged underwater in the bathtub, and now has to accompany him in the bathroom.  (Tr. 45).  A.W. has sudden crying spells and cannot describe what is wrong when asked.  (Tr. 46).  At one point, Mann suspected that A.W. had been molested when he was younger.  (Tr. 47).

A.W.'s condition caused him to miss several days of school.  As a result he had to repeat the second grade.  (Tr. 39).  Whenever A.W. experienced an episode at school, his teacher would wake him up and let him continue his school day, unless he fell asleep for more than 45 minutes, at which time the teachers would call his mother to take him home.  (Tr. 41).  Despite this and other symptoms, in a Social Security School Activities Questionnaire, A.W.'s teacher, Ms. Kendricks, reported that A.W. had "average" abilities in several areas of functioning in relation to other students in the class.  For example, she believed that A.W. had an "average" attention span and concentration in class, and an "average" ability to work independently of teacher supervision.  (Tr. 136).  She also opined that A.W. had an "average" ability to understand and complete assignments on time, respond to changes of routine, and progress in learning the skills involved in reading, writing, and mathematics.  (Tr. 136).  According to Ms. Kendricks, A.W. got along with his peers and teachers, and participated in sports, games, and other extracurricular activities.   (Tr. 136-37).

**B. Medical Evidence**[1]

The record is unclear as to what A.W.'s disorder should be labeled because throughout A.W.'s  hospitalizations and numerous medical evaluations, his disorder has been referred to as several diagnoses.  A.W.'s doctors have diagnosed his condition as a pseudoseizure disorder,[2] a conversion disorder,[3] and a psychogenic seizure disorder.[4]  (Tr. 224, 452).  The ALJ seems to believe that A.W.'s impairment is a conversion disorder, rather than a pseudoseizure disorder.  (Tr. 19).

Although there is no clear diagnosis, all parties agree that A.W.'s disorder manifests as different types of episodes: seizures and sleepwalking episodes.  According to the record, the seizure-like episodes sometimes cause A.W. to appear to be in a sleep-like state, but he is unable to be waken.  Sometimes these episodes conclude with shaking of the limbs.  When the episodes occur at night, they are classified as sleepwalking episodes.  When A.W. has a sleepwalking episode, he sometimes wanders about and becomes violent.  Despite the dynamic diagnoses from the onset of his condition, Plaintiff as well as A.W.'s treating physician currently refer to A.W.'s condition as

---

[1] There is a vast amount of medical evidence in this case; the Court summarizes only the evidence which is pertinent to the Court's decision.

[2]  Pseudoseizures resemble epileptic seizures but have purely psychological causes; they lack the brain activity characteristic of epilepsy and the patient may be able to stop them by an act of will.  Dorland's Illustrated Medical Dictionary 1537 (30th ed. 2003).

[3] A conversion disorder is defined as a condition in which a person has blindness, paralysis, or other nervous system symptoms that cannot be explained.  *See Medline Plus* [internet].  Bethesda (MD): National Library of Medicine (US); *available at* http://medlineplus.gov/.

[4] Psychogenic seizures are also referred to as pseudoseizures.  *See Medline Plus* [internet].  Bethesda (MD): National Library of Medicine (US); *available at* http://medlineplus.gov/.

4

a pseudoseizure disorder.  (Tr. 397).

It is critical to note that A.W. has pseudoseizures, not real epileptic seizures.  Although A.W. was diagnosed with epilepsy in January of 2006, this diagnosis was later invalidated by a normal EEG in May of 2006.  (Tr. 195, 224).  Tests performed in January of 2009 later confirmed that A.W.'s condition was not epileptic in nature.  (Tr. 409).

It is not necessary for the court to determine the diagnosis of A.W.'s condition, but for the sole purpose of clarity, A.W.'s disorder will be referred to as a pseudoseizure disorder.

### 1. State Agency Medical Consultants

In 2006, four state agency medical sources evaluated A.W.'s condition.  (Tr. 246, 289).  Dr. John Mormol, a physician, and Dr. Cindy Matyi, a psychologist, assessed A.W. in August of 2006.  Four months later, in December of 2006, Pediatrician Craig Thompson, and, Dr. Catherine Flynn, a psychologist, evaluated A.W.  (Tr. 244, 289).  All four doctors concluded that A.W. was suffering from a sleep disorder, parasomnia, and functional enuresis.  (Tr. 243, 286).  Although the doctors noted that the combination of A.W.'s impairments was severe, they agreed that his impairments did not meet, medically equal, or functionally equal a listing.  (Tr. 243, 286).

In assessing whether A.W. was functionally disabled based upon his abilities in six domains, all four doctors agreed that he had no limitation in the domains of interacting and relating with others, and moving about and manipulating objects.  (Tr. 245-46, 288-89).  They further assented that A.W. had a less than marked limitation in the domain of attending and completing tasks.  (Tr. 245, 288).  Additionally, all four doctors shared the opinion that A.W. had a marked limitation in the domain of caring for yourself.  (Tr. 246, 289).

The doctors only disagreed regarding A.W.'s abilities in the domains of acquiring and using information, and health and physical well-being.  Drs. Mormol and Matyi found A.W. had no limitation in the domains of acquiring and using information, and health and physical well-being.  (Tr. 245-46).   However, Drs. Thompson and Flynn opined that A.W. had a less than marked limitation in these domains.  (Tr. 288-89).  Drs. Thompson and Flynn explained that their opinions differed from Drs. Mormol and Matyi because Mann reported seizure-like activity, but when A.W. was evaluated for seizures, no evidence supported the diagnosis of epileptic seizures.  (Tr. 289).  Their report commented that A.W.'s neurological exams and EEG's were consistently normal, and that his treating source referred him to a psychologist for evaluation based on his symptoms.  (Tr. 289).

### 2. Dr. Mary Brown-Harrison, Treating Pediatrician

On September 25, 2008, Dr. Mary Brown-Harrison, A.W.'s treating pediatrician, completed a medical questionnaire regarding A.W.'s eligibility for Supplemental Security disability.  (Tr. 396-99).  Dr. Harrison's report indicated that A.W. had pseudoseizures which occurred more than once a month, and had excellent compliance with treatment.  (Tr. 396).  The doctor also evaluated A.W.'s functional abilities under each of the six domains.  Although she indicated that she was "unable to comment" on the domains of acquiring and using information, attending and completing tasks, and interacting and relating with others, she opined that A.W. had no limitation in the domains of moving about and manipulating objects, and caring for himself.  (Tr. 397).  Finally, she concluded that A.W. had a moderate limitation in the domain of health and physical well-being, and stated that "[t]he pseudoseizures have a negative impact on [A.W.'s] functioning and learning at school."  (Tr. 397).

6

### 3. Formal Assessments by Physicians & Other Professionals

Dr. David House, a Psychologist, examined A.W. on July 25, 2006 to assess his mental faculties.  (Tr. 238-42).  Dr. House observed that A.W. had no overt signs of physical discomfort or motor disturbance.  (Tr. 241).  The doctor opined that A.W.'s concentration and attention did not appear to be limited, his pace was adequate, and he persisted and tried to complete the examination tasks.  (Tr. 241).  A.W.'s level of speech reflected adequate articulation for his age and education.  (Tr. 241).  Although A.W. stated that he heard voices, when asked about what was being said to him, A.W. said that he forgot and could not tell Dr. House what he heard.  (Tr. 240-41).  Dr. House believed that these episodes might be bad dreams, as they occurred primarily at night.  (Tr. 240).

In April of 2007, Child Psychologist, Dr. Vidhya Jaishankar, evaluated A.W.'s psychiatric condition.  (Tr. 293-98).  Dr. Jaishankar noted that A.W. was repeating second grade because he missed a lot of school the prior year due to hospitalizations and clinic visits.  (Tr. 296).  Regardless, she noted that he was a very bright student, maintained good grades, and had no reported learning disorders, school discipline, or special education services.  (Tr. 296).

Dr. Johanna Morton, a neurologist,  reviewed A.W.'s medical history in January of 2009.  (Tr. 401-05).  She noted that A.W. was taking Adderall to help him stay awake at school.  (Tr. 402).  Her report indicated that A.W. was in fourth grade, liked school, and was an honor roll student who performed well in mathematics and had some difficulty with reading.  (Tr. 402).  She also observed that A.W. enjoyed football, played at home, and rode his bicycle.  (Tr. 402).  Dr. Morton suggested that A.W.'s symptoms indicated pseudoseizures, and recommended the he continue treatment with a psychiatrist.  (Tr. 403).

### III.  STANDARD FOR CHILDHOOD SSI CASES

A child under age eighteen will be considered disabled if he/she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations." 42 U.S.C. § 1382c(a)(3)(C)(i).  Childhood disability claims involve a three-step process evaluating whether the child claimant is disabled.  20 C.F.R. § 416.924.  First, the ALJ must determine whether the child claimant is working.  If not, at step two the ALJ must decide whether the child claimant has a severe mental or physical impairment  Third, the ALJ must consider whether the claimant's impairment(s) meet or equal a listing under 20 C.F.R. Part 404, Subpart P, Appendix 1.  An impairment can equal a listing medically or functionally.  20 C.F.R. § 416.924.

The regulations provide six domains that an ALJ must consider when determining whether a child functionally meets a listing:

> (1) Acquiring and using information;

> (2) Attending and completing tasks;

> (3) Interacting and relating with others;

> (4) Moving about and manipulating objects;

> (5) Caring for yourself; and,

> (6) Health and physical well-being.

20 C.F.R. § 416.926a(b)(1).  In order to establish a functional equivalent to a listing, the claimant must show an extreme limitation in at least one domain, or a marked impairment in two domains.

20 C.F.R. § 416.926a(d).  The regulations define "marked" and "extreme" impairments:

> We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities...[it] also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with

scores that are at least two, but less than three, standard deviations below the mean.

20 C.F.R. § 416.926a(e)(2)(i).

We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities...[it] also means a limitation that is "more than marked."  "Extreme" limitation is the rating we give to the worst limitations.  However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function.  It is the equivalent of the functioning we would expect to find on standardized testing scores that are at least three standard deviations below the mean.

20 C.F.R. § 416.926a(e)(3)(i).

On the other hand, a child is eligible for benefits if he/she medically equals a listing.  A claimant medically equals a listing if the child's impairment is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a).  Yet, in order to medically equal a listing, the child's impairment(s) must meet all of the specified medical criteria.  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530-32 (1990).

Furthermore, the regulations require the ALJ to consider certain evidence in the record.  During an evaluation of a child disability claim, the ALJ must consider information from the child's teachers.  20 C.F.R. § 416.926a(a).  The regulations also direct the ALJ to look at how the child performs daily activities in comparison to other children the child's age.  20 C.F.R. § 416.926a(b)(3)(i-ii).

Additionally, the ALJ must consider the medical opinion evidence in the record.  20 C.F.R. § 416.927.  A treating physician's opinions should be given controlling weight when they are well-supported by objective evidence and are not inconsistent with other evidence in the record.  20 C.F.R. § 416.927(d)(2).  When the treating physician's opinions are not given controlling weight,

the ALJ must articulate good reasons for the weight actually assigned to such opinions.  *Id.*  Finally, an ALJ must account for the opinions of the non-examining sources, such as state agency medical consultants, and other medical opinions in the record.  20 C.F.R. § 416.927(f)(2)(i-ii).

## IV. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence and whether, in making that decision, the Commissioner employed the proper legal standards.  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  "Substantial evidence" has been defined by the Sixth Circuit as more than a scintilla of evidence, but less than a preponderance of the evidence.  *See Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if a reasonable mind could accept the record evidence as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed.  *Id.*  While the Court has discretion to consider the entire record, this Court does not determine whether issues of fact in dispute would be decided differently, or if substantial evidence also supports the opposite conclusion.  The Commissioner's decision, if supported by substantial evidence, must stand.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility.  *See Garner*, 745 F.2d at 387.  However, it may examine all evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

# V. <u>ANALYSIS</u>

After reviewing the record, the ALJ applied the three step process and ruled that A.W. was not disabled.  At step one, ALJ Hanekamp found that A.W. had never worked.  (Tr. 19).  At step two, ALJ Hanekamp found that A.W. had a "conversion disorder versus a pseudoseizure disorder, and a sleepwalking disorder"[5] which both constituted "severe" impairments.  (Tr. 19).  However, at step three, ALJ Hanekamp determined that A.W.'s impairments did not medically or functionally equal a listing.  (Tr. 20-26).  The ALJ explained that he gave special consideration to the impairments found in sections 111.02 (Convulsive Epilepsy or Convulsive Epilepsy Syndrome), 111.03 (Nonconvulsive Epilepsy), and 112.07 (Somatoform, Eating, and Tic Disorders) of the listings under 20 C.F.R. Part 404, Subpart P, Appendix 1.  ALJ Hanekamp ruled that A.W. did not medically equal the listings for Convulsive Epilepsy or Convulsive Epilepsy Syndrome  (111.02), or Nonconvulsive Epilepsy (111.03) because the evidence did not support a high frequency of seizures.  (Tr. 20).  Similarly, the ALJ concluded that A.W. did not functionally equal a listing because A.W. only had a marked limitation in one domain, caring for yourself.  (Tr. 26).  The ALJ found a "less than marked" limitation in the domains of health and physical well-being, acquiring and using information, and attending and completing tasks, and no limitations in the remaining domains.  (Tr. 24-26).

---

[5] The ALJ alludes to the fact that A.W.'s impairment is a conversion disorder, rather than a pseudoseizure disorder or a sleepwalking disorder.  At one point, A.W. was diagnosed with a conversion disorder, but his diagnosis changes frequently throughout the record.  As discussed *supra*, the Court refers to A.W.'s impairment as a pseudoseizure disorder for consistency and clarity.

Plaintiff asks this court to remand this case due to several errors made by the ALJ.  First, Plaintiff maintains that the ALJ failed to give good reasons for discrediting A.W.'s treating physician regarding the frequency of A.W.'s seizure-like episodes.  Second, Mann challenges whether the ALJ was correct in determining that A.W.'s pseudoseizure disorder did not medically equal the criteria to satisfy listing 111.02(A) for Convulsive Epilepsy or 111.02(B) for Convulsive Epilepsy Syndrome.  Third, Plaintiff argues that ALJ Hanekamp should have determined that A.W.'s disorder functionally equaled a listing because A.W. had marked impairments in three domains of functioning: 1) caring for yourself; 2) health and physical well-being; and 3) interacting and relating with others.   Fourth, Plaintiff  attacks ALJ Hanekamp's failure to properly analyze 132 pages of additional medical evidence.  Finally, Plaintiff argues that the ALJ failed to follow the Social Security regulations in determining the credibility of Mann's testimony.

Finding that none of Plaintiff's arguments have considerable merit, the undersigned affirms the decision of the ALJ.  For the reasons set forth below, the undersigned finds that the ALJ's decision was supported by substantial evidence.

### A. Whether A.W.'s Impairments Medically or Functionally Equaled a Listing

### 1. Medically Equaled

During the disability evaluation process, the ALJ found that A.W. had a severe impairment but concluded that neither A.W.'s pseudoseizure disorder nor his sleepwalking disorder medically equaled a listing.  (Tr. 19-20).   Mann asserts that ALJ Hanekamp erred by finding that A.W.'s seizures were not frequent enough to satisfy the requirements of listing 111.02(A) for Convulsive Epilepsy, which requires "the occurrence of more than one major motor seizure per month." 20 C.F.R. Part 404, Subpart P, Appendix 1. Plaintiff contends that this error was caused by ALJ

Hanekamp's failure to properly weigh Dr. Harrison's findings that A.W.'s pseudoseizures occurred at least once a month. Finally, Plaintiff asserts that ALJ Hanekamp should have stated "good reasons" for not giving controlling weight to Dr. Harrison's opinion regarding the frequency of A.W.'s seizures. *See* 20 C.F.R. § 416.927(d)(2), *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546 (6th Cir. 2004).

The ALJ provided a brief explanation of why he ruled that A.W.'s pseudoseizure disorder did not meet the listing for 111.02 (Convulsive Epilepsy or Convulsive Epilepsy Syndrome), 111.03 (Nonconvulsive Epilepsy), or 112.07 (Somatoform, Eating, and Tic Disorders):

> [Dr. Harrison's] opinion that [A.W.] has been having at least one pseudoseizure a month is not supported by the record as a whole...[a]llegations that [A.W.] has had listing-level pseudoseizures at this frequency are not credible given the record as a whole including the state agency medical consultants' interpretation of the evidence.

(Tr. 20). ALJ Hanekamp's explanation included a footnote with references to various medical records in order to explain why he assigned less weight to the opinion of A.W.'s treating physician regarding the frequency of A.W.'s seizures. Plaintiff maintains that the ALJ's footnote does not satisfy the good reasons requirement.

The ALJ's footnote cited a teacher questionnaire, hospital records, psychological evaluations, as well as portions of Mann's hearing testimony. Presumably, the ALJ drafted this footnote intending that it would show evidence, or offer sufficient reasons, to bolster his decision to discredit Dr. Harrison's opinion. (Tr. 20-21). However, it is not apparent to the undersigned how the records cited substantiate the ALJ's decision. Nevertheless, it is not necessary for this Court to analyze the ALJ's reasoning regarding his assessment of Dr. Harrison's opinion because even if ALJ Hanekamp improperly discredited Dr. Harrison's opinion, A.W. still would not have medically equaled listing 111.02(A) for Convulsive Epilepsy. To satisfy the listing requirements

13

for 111.02(A) Convulsive Epilepsy, the claimant must have an "established diagnosis of epilepsy." 20 C.F.R. Part 404, Subpart P, Appendix 1.

In *Coleman v. Astrue*, the Middle District of Tennessee decided a case in which the claimant had a similar pseudoseizure disorder.  The Court held that the claimant's pseudoseizure disorder did not medically equal the listing for Convulsive Epilepsy or Convulsive Epilepsy Syndrome because her episodes were not epileptic in nature.  *Coleman v. Astrue,* No. 3:05-0389, 2010 WL 28567, at *12 (M.D. Tenn. Jan. 5, 2010).  Although the claimant  appeared to be experiencing seizure episodes, after EEG testing, doctors determined that her condition was not epilepsy, and diagnosed her with pseudoseizures.  *Id.* at *11.  Accordingly, the Middle District of Tennessee ultimately concluded that the claimant did not meet or equal listings 11.02 for Convulsive Epilepsy or 11.03 for Nonconvulsive Epilepsy because she did not have a diagnosis of epilepsy.  *Id.* at *11, 13.

Similarly, A.W. does not have a diagnosis of epilepsy, as noted in Mann's hearing testimony[6] and from A.W.'s EEG test results.  (Tr.39, 409).   Although A.W. was initially diagnosed with epilepsy at the onset of his condition, video EEG analysis confirmed that his seizures were not epileptic in nature, thus precluding him from medically equaling listing 111.02(A) for Convulsive Epilepsy.  (Tr. 409).  "In order to be found disabled based upon a listed impairment, the claimant must exhibit all the elements of the listing." *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) (citing  20 C.F.R. § 416.924(a)).  "It is insufficient that a claimant comes close to meeting the requirements of a listed impairment." *Elam ex. rel. Golay* at 125 (citing *Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1986)).  Thus, even if ALJ Hanekamp would have fully

---

[6] Mann testified, "his legs kind of like just shake a little bit.  Not like, I've seen epileptic seizures.  It's nothing like that." (Tr. 39).

credited Dr. Harrison's opinions, A.W. still would not have medically equaled  listing 111.02(A) because he did not have a diagnosis of epilepsy.

Next, Plaintiff argues that the ALJ failed to mention whether A.W.'s impairment met or medically equaled listing 111.02(B) for Convulsive Epilepsy Syndrome, which requires seizures only once a year.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1.  Instead, Plaintiff contends that the ALJ focused solely on whether A.W. had pseudoseizures more than once a month, a requirement only relevant to listing 111.02(A) for Convulsive Epilepsy.  As in listing 111.02(A) for Convulsive Epilepsy, listing 111.02(B) for Convulsive Epilepsy Syndrome requires a diagnosis of epilepsy. *Id.* Plaintiff did not satisfy the requirements of the listing for the reasons previously discussed.

Given that A.W.'s seizures were not determined to be epileptic in nature, the ALJ was effectively precluded from applying listings 111.02(A) and 111.02(B) since those listings deal with conditions requiring a diagnosis of epilepsy.[7]  Thus, the ALJ's conclusion that the claimant did not medically meet or equal a listed impairment is supported by substantial evidence in the record.

## 2. Functionally Equaled

The ALJ ruled  that A.W. did not functionally equal any listing because A.W. only had a marked limitation in one domain, caring for yourself.  (Tr. 26).  ALJ Hanekamp found a "less than marked" limitation in the domains of health and physical well-being, acquiring and using information, and attending and completing tasks, and no limitations in the remaining domains.  (Tr. 24-26).

---

[7] Plaintiff does not argue that A.W.'s impairment meets or equals listing 111.03 for Nonconvulsive Epilepsy, or 112.07 for Somatoform, Eating, and Tic Disorders.

Plaintiff attacks the ALJ's decision on two grounds.  First, Plaintiff argues that A.W. also had a marked impairment in the domains of health and physical well-being, and interacting and relating with others.  Plaintiff does not object to the ALJ's finding that A.W. had a marked limitation in the domain of caring for yourself.  Second, Mann maintains that ALJ Hanekamp erred in failing to properly analyze 132 pages of additional medical evidence in the record.  Relatedly, Plaintiff claims that the ALJ erroneously relied on the state agency physicians evaluations instead of giving controlling weight to A.W.'s treating physician, who had an opportunity to review the bulk of the new evidence.

### a. Health and Physical Well-Being

The domain of health and physical well-being considers the cumulative effect of the child's physical and/or mental impairments on the child's functioning.  [20 C.F.R. § 416.926a(l)](#).  Examples of limited functioning in this domain include somatic complaints related to the child's impairment, such as weakness, seizures, insomnia, headaches or incontinence.  [20 C.F.R. § 416.926a(l)(4)(ii)](#).  Plaintiff argues that the ALJ failed to properly evaluate A.W.'s limitations in this domain.  Although ALJ Hanekamp acknowledged that A.W.'s pseudoseizure disorder had affected his functioning, the ALJ nevertheless found that A.W.'s limitation in this domain was "less than marked."  (Tr. 26).  In reaching this decision, ALJ Hanekamp explained that he relied upon the state agency medical consultants' interpretation of the evidence.  Plaintiff argues that this ruling is not correct because there is evidence which supports that A.W. has a marked limitation in this domain.

Mann claims that A.W.'s treating physician's opinion and medical evidence from the record sustains a marked limitation in this domain.  (Pl.'s Br. at 15-16).  Plaintiff proffered evidence that A.W., as a result of his impairments, does not maintain a healthy emotional and physical state.  For

16

instance, he experienced auditory hallucinations which terrified him.  Plaintiff further argues that A.W.'s need to repeat the second grade evidences a marked limitation in this domain.  Next, Plaintiff suggests that SSR 09-8p instructs an ALJ to automatically find a marked limitation in the domain of health and physical well-being when the ALJ finds a marked limitation in the domain of caring for yourself.

Although the ALJ did not dedicate much discussion to this domain of functioning, the Court finds that substantial evidence supports the ALJ's determination that A.W. did not have a marked limitation in this domain.  ALJ Hanekamp's decision was primarily based upon the opinions of A.W.'s treating physician and the state agency physicians.  (Tr. 26).  Dr. Harrison noted that A.W. only had a moderate limitation in this domain.  (Tr. 397).  Furthermore, the state agency medical experts found that A.W. did not have a marked limitation in this domain.  (Tr. 426, 289). The ALJ's finding was consistent with the medical opinions on record..

Contrary to Plaintiff's contention, A.W.'s auditory hallucinations were not indicative of a marked impairment in this domain.  For example, when Dr. House questioned A.W. about the voices, A.W. said that he forgot and could not tell Dr. House what he had heard.  (Tr. 240-42).  This conversation with A.W. led Dr. House to believe that the auditory hallucinations might be bad dreams, as they occurred primarily at night.  (Tr. 240-42).  Similarly, A.W.'s need to repeat the second grade does not necessarily mean that he has a marked impairment.  Notably, A.W. has not repeated any grades since second grade.  (Tr. 33).  Additionally, A.W.'s testimony and psychological evaluations reveal that he has average intellectual abilities, achieves good grades in his school classes, and engages in a variety of activities, such as football and riding his bicycle.  (Tr. 35, 136, 241, 296, 305, 402).  Dr. Morton described A.W. as an honor roll student who was good

17

at mathematics, able to stay awake at school with Adderall, and avoided seizure episodes at school by keeping active.  (Tr. 402).  Thus, the record as a whole supports the ALJ's finding that A.W. had a less than marked limitation in the domain of health and physical well-being.

Lastly, Plaintiff claims that SSR 09-8p compels the ALJ to automatically find a marked limitation in the domain of health and physical well-being when he determines that the claimant has a marked limitation in the domain of caring for yourself.  Plaintiff mischaracterizes the meaning of SSR 09-8p; the regulation admonishes the ALJ to consider the cumulative effects of the child's symptoms, impairments, and treatment.  SSR 09-8p explains that impairments that affect health and physical well-being can have effects in other domains as well.  For example, "a child who must frequently miss school because of illness . . . may have social limitations that we also evaluate in the domain of '[i]nteracting and relating with others,' behavioral manifestations that we evaluate in the domain of '[c]aring for yourself,' or both."  SSR 09-8p.  However, the ruling indicates that the commissioner should "not consider a limitation in [any domain]...unless it results from a medically determinable impairment(s)."  SSR 09-8p.  Therefore, if the ALJ does not have the medical basis for finding a limitation in the domain of health and physical well-being, then he can not find a limitation in the domain of caring for yourself, using the cumulative reasoning SSR 09-8p suggests.

### b. Interacting and Relating with Others

Mann next claims that the ALJ erred in deciding that A.W. had no limitation in the domain of interacting and relating with others.  This domain considers how well the child initiates and sustains emotional connections with others, develops and uses the language of the community, cooperates with others, and complies with rules.  20 C.F.R. § 416.926a(i).  Examples of limitations in this area include when the child has no close friends, or has difficulty playing games or sports

18

with rules, or difficulty communicating with others or speaking intelligibly.  20 C.F.R. § 416.926a(i)(3)(i-vi).

Plaintiff argues that there is evidence in the record supporting a marked limitation in this domain.  For example, Mann noted that A.W. cannot socialize as a normal child his age due to his pseudozeisures.  (Tr. 114-121).  Plaintiff also points out  that A.W.'s friends are afraid of his condition, which is related to the impression that his peers get when they see him having seizures in class and being removed by paramedics.  (Tr. 366-375).

Despite Mann's contentions, the undersigned finds that the ALJ's lack of finding on this domain was based upon the abundance of evidence demonstrating no limitation in this domain.  ALJ Hanekamp first noted contradictions in Mann's hearing testimony.  For example, Mann reported that A.W. had "lots of friends"and playmates at school, and got along "very well" with them all.  (Tr. 93, 110).  Additionally, Mann testified that A.W. did not have any behavioral problems at school, had never been disciplined or suspended for behavior problems, and related well with other students, teachers, and family members.  (Tr. 94, 111).  A.W.'s current teacher's opinions also supported the ALJ's finding, in which the teacher commented that A.W. behaved well with peers and teachers, and his only behavior problem was falling asleep in class.  (Tr. 136).

ALJ Hanekamp also supported his decision with the uncontradicted opinions of the state agency medical consultants who found no limitation in this domain.  (Tr. 245, 288).  The state agency medical experts explained that A.W. had many friends, got along well with them, and did not have any temper difficulty.  (Tr. 245, 288).  Dr. Harrison stated that she was unable to comment

on this domain of functioning.[8]  (Tr. 397).  Since the opinions of the state agency consultants were consistent with the record as a whole, the ALJ was entitled to rely upon this evidence in support of his decision.  (Tr. 25).  *See* 20 C.F.R. § 416.927(f)(2)(i).  Thus, the ALJ's determination was supported by substantial evidence in the record.

### i. Additional Evidence

As an aside, Plaintiff argues that it was error for the ALJ to rely on the opinions of the state agency physicians who did not review the 132 pages of additional medical evidence, instead of relying on Dr. Harrison, who reviewed nearly all of the evidence.  Furthermore, Mann argues that the ALJ should have obtained an updated medical opinion to appropriately analyze whether A.W. functionally equaled a listing. The Court notes that there is case law indicating that remand is warranted when an ALJ solely relies upon the opinions of state agency physicians who do not review the entire record.  *See Fisk v. Astrue,* 253 F. App'x 580, 585 (6th Cir. 2007).  However, in this case the ALJ's decision to credit the opinions of the state agency physicians over the opinion of Dr. Harrison benefitted Plaintiff.  Plaintiff benefitted because the state agency physicians found a greater restriction on A.W.'s functional abilities than did Dr. Harrison.  For example, ALJ Hanekamp relied upon the state agency doctors opinions in finding that A.W. had a marked limitation in the domain of caring for yourself.  (Tr. 243-48, 286-89).  But, Plaintiff did not challenge this finding.  However, Dr. Harrison, who was privy the 132 pages of updated records, found no limitation in the domain of caring for yourself.  (Tr. 396-98).  In fact, Dr. Harrison did not opine that A.W. had a marked limitation in any domain.  Rather, she merely concluded that he had

---

[8] The Court believes that Dr. Mary Brown-Harrison was unable to comment on the domains of acquiring and using information, attending and completing tasks, and interacting and relating with others, because she is Plaintiff's pediatrician, not his psychologist.

a moderate limitation in the domain of health and physical well-being.  Consequently, if ALJ Hanekamp would have entirely adopted Dr. Harrison's opinion, it would have directed a finding of not disabled.  Therefore, the ALJ's decision inured to the benefit of A.W., and caused him no harm.

What is striking is that even after A.W.'s treating physician had a chance to review nearly all these additional records, she still did not find a marked impairment in any domain of functioning. (Tr. 395-98).  If this new evidence was not compelling enough to cause Dr. Harrison to find a marked limitation in any domain of functioning, then this Court finds no reason why it would change the opinions of the state agency medical experts, who did not have the same historical  knowledge of A.W.'s medical condition as Dr. Harrison.

Although Plaintiff argues that the ALJ erred in concluding that A.W. had no limitation in the domains of health and physical well-being and interacting and relating with others, Plaintiff has the ultimate burden of proof to establish an entitlement to Supplemental Security income by proving the existence of a disability.  *Cornn v. Comm'r of Soc. Sec.*, 7 F. App'x 369, 371 (6th Cir. 2001).  Even assuming that something in the 132 pages of additional records confirmed that A.W. had marked or extreme limitations in these domains, Plaintiff failed to cite any specific record evidencing such.

Mann claims that the ALJ erred in failing to seek an updated medical opinion to appropriately analyze the additional evidence.  This argument is not well taken.  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to seek assistance from a medical expert unless the ALJ believes that the additional evidence may change the state agency physicians' finding.  *See Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 830 (6th Cir. 2009); SSR 96-6p.  Here, the ALJ reviewed all of the evidence of record and was not persuaded that a medical expert was necessary.  Under these circumstances, the ALJ had no duty to seek a medical expert opinion.  *See*

21

SSR 96-6p.  The undersigned finds no error in the ALJ's decision to decline seeking the opinion of a medical expert.

### 3. Whether the ALJ Correctly Assessed Plaintiff's Credibility

Finally, Plaintiff maintains that the ALJ improperly assessed Plaintiff's credibility.  It is well established that an ALJ's credibility determinations are to be given great weight.  *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007).  In this case, it was particularly important for the ALJ to carefully weigh Mann's credibility because the claimant, A.W., was only eleven years old at the time of the hearing.  (Tr. 32).  Thus, it was appropriate for the ALJ to consider Mann's credibility in determining the severity of A.W.'s symptoms.  *See Hickman ex rel. v. Astrue*, No. 7:07-CV-1077, 2010 WL 2985968, at *12 (N.D.N.Y. July 27, 2010) ("If the child claimant is unable adequately to describe his symptoms, the ALJ must accept the description provided by testimony of the person most familiar with the child's condition, such as a parent").

Having reviewed the record and the ALJ's decision in its entirety, the Court finds that the ALJ provided sufficient justification for discrediting Plaintiff's credibility.  In explaining the weight given to Mann's testimony, the ALJ stated:

> The testimony of [A.W.]'s mother about the onset of his pseudoseizures is generally and reasonably consistent with the statements she has made to treating medical sources; however her testimony about the nature, frequency, and extent of the pseudoseizures is more consistent with the evidence relating to the period before counseling and medication resulted in improvement, and it is not consistent with the more recent medical and other evidence of record.

(Tr. 22).

In assessing Mann's credibility, the ALJ compared statements Mann made in reports, during the hearing, and during various psychological evaluations.  (Tr. 20-23).  ALJ Hanekamp noted discrepancies between Mann's hearing testimony and her statements to A.W.'s treating physician,

especially regarding the frequency of the pseudoseizures.  (Tr. 21-23).  For example, at the hearing Mann testified that A.W. fell asleep in school twice per day and other times two to three times per week.  (Tr. 21, 41).  The ALJ then referenced a medical report from October of 2007 in which Mann told Dr. Harrison that A.W. had only fallen asleep at school three times that year.  (Tr. 346).  Mann also told Dr. Harrison that A.W.'s pseudoseizures were very rare and that h e was doing well academically.  (Tr. 23, 346).  Furthermore, ALJ Hanekamp did not fully believe Mann's contentions that A.W.'s symptoms were severe based on his own observations of A.W. during the hearing at which A.W. appeared to be cheerful and engaging, and readily answered questions asked of him. (Tr. 21).  Based on the Court's review, ALJ Hanekamp offered sufficient reasons justifying the weight given to Mann's credibility, therefore the Court declines to disturb the current decision.

## VI. **DECISION**

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence.  Accordingly, the Court AFFIRMS the decision of the Commissioner.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date: July 15, 2011.

23